IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| MARGARET A. RANDOLPH, TRUSTEE FOR THE MARGARET A. RANDOLPH REVOCABLE TRUST U/A 03/06/97, Derivatively on Behalf of ALTRIA GROUP, INC., <br><br>                      Plaintiff, <br><br>      v. <br><br>WILLIAM F. GIFFORD, JR., HOWARD A. WILLARD III, JOHN T. CASTEEN III, DINYAR S. DEVITRE, THOMAS F. FARRELL II, DEBRA J. KELLY-ENNIS, W. LEO KIELY III, KATHRYN B. MCQUADE, GEORGE MUÑOZ, MARK E. NEWMAN, NABIL Y. SAKKAB, VIRGINIA E. SHANKS, ELLEN R. STRAHLMAN, KEVIN C. CROSTHWAITE, JR., ADAM BOWEN, KEVIN BURNS, JAMES MONSEES, RIAZ VALANI, NICHOLAS J. PRITZKER, and JUUL LABS, INC., <br><br>                      Defendants, <br><br>    and, <br><br>ALTRIA GROUP, INC., <br><br>                  Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br>Civil Action No. 3:21cv00209 <br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br>**JURY TRIAL DEMANDED** |

Plaintiff Margaret A. Randolph, Trustee for the Margaret A. Randolph Revocable Trust U/A 03/06/97 ("Plaintiff"), by and through her undersigned attorneys, alleges the following upon personal knowledge as to all allegations concerning herself, and upon information and belief as to all other allegations based, among other things, upon the investigation conducted by her attorneys, which includes a review of filings with the U.S. Securities and Exchange Commission ("SEC"), news reports, press releases, and other publicly available sources, as well as filings from various proceedings, including the securities class action captioned *Klein et al., v. Altria Group, Inc. et al.,*

No. 3:20-cv-00075-DJN (E.D. Va.) (the "Securities Action"), currently pending in this U.S. District Court.  Plaintiff believes that after a reasonable opportunity for discovery is afforded, substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.      This shareholder derivative action is brought on behalf of nominal defendant Altria Group, Inc. ("Altria" or the "Company"), against certain current and former members of the Company's Board of Directors (the "Board"), certain of its executive officers, and certain current and former officers of JUUL Labs, Inc. ("JUUL"), for breach of their fiduciary duties of loyalty, care, and candor to Company shareholders, aiding and abetting breach of their fiduciary duties, violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, unjust enrichment, and waste of corporate assets.

2.      Altria is a holding company that has produced and marketed tobacco and other products in the United States for the past century.  Through its wholly owned subsidiaries, the Company sells cigarettes, e-cigarettes, pipe tobacco, smokeless tobacco, and wine, among other products, under various brand names, including the Marlboro brand.

3.      JUUL is a manufacturer and seller of e-cigarette electronic nicotine delivery systems ("ENDS" or "e-cigarettes").  Since 2015, JUUL has marketed and sold an e-cigarette vaporizer (or "Vape"), similar in shape and size to a USB flash drive, and "pods," i.e. nicotine filled cartridges that fit into the Vape.  According to its website, JUUL "was founded with the goal of helping to transition the world's one billion adult smokers away from combustible cigarettes."[1]

4.      JUUL's products have been successful in significant part because of their

---

[1] JUUL Labs, Our Mission, available at:
https://www.juullabs.com/about/company/#:~:text=Juul%20Labs%20was%20founded%20with,the%20harm%20associated%20with%20tobacco (last accessed March 10, 2021).

popularity with underage persons, who make up a large portion of JUUL's overall customer base. JUUL marketed its products to underage smokers and sold cartridges with child-friendly flavors such as mango, mint, crème brûlée, mixed fruit, and cucumber, all of which were banned by the FDA in 2009 for combustible cigarettes. ***Indeed, JUUL's products were originally designed for and have at all times been marketed towards minors and young adults***. Many of JUUL's youth targeted advertisements, one of which appears below, were placed on websites that JUUL knew were frequented in significant part by children and teens, including: nickjr.com; cartoonnetwork.com; hellokids.com; mathplayground.com; socialstudiesforkids.com; teen.com; seventeen.com; and thecollegeprepster.com, among many others.



5.      JUUL claims its products are less harmful than combustible cigarettes even though its cartridges contain significant amounts of nicotine, a highly addictive central nervous system stimulant. JUUL's cartridges contained nicotine salt, created by combining nicotine derived from tobacco products with benzoic acid, which was meant to deliver as much nicotine as a cigarette, so that ***one pod would be equivalent to a pack of twenty cigarettes***. JUUL cartridges contained more nicotine than cigarettes because a greater percentage of the nicotine in the nicotine salt solution can be released than the nicotine from a cigarette. JUUL's products therefore had the potential to give users more nicotine, not less, than cigarettes. Rather than publicize this

information, JUUL held out its Vape as the ultimate tobacco cessation product, as illustrated by the advertisement below where JUUL held its product out as a way to help smokers quit. "The average smoker tries to quit 30 times. Make the switch."



6.     Altria developed and sold its own ENDS e-cigarette products, but they were not as successful as JUUL's. By 2018, JUUL's ENDS e-cigarettes accounted for approximately 70% of the market.

7.     At some point Altria evidently learned that its ENDS e-cigarette products were being purchased by minors and concluded that selling those products carried legal or public-relations risks. On October 25, 2018, Altria announced it would remove its pod-based e-cigarette products from the market until it "receive[d] a market order from the FDA or the youth issue is otherwise addressed." On December 7, 2018, the Company issued a press release announcing the discontinuation of all its e-vapor products.

8.      By December 2018, the latest, the Altria Defendants[2] had knowledge that JUUL's advertising and marketing practices targeted youth populations, including because it had longstanding institutional knowledge of, and for years participated in, these same practices. Indeed, 20 years earlier in 1998, Philip Morris International ("Philip Morris"), a predecessor company to Altria, signed a comprehensive agreement with 46 states attorneys general that *permanently* prohibited Philip Morris and other tobacco companies from ***directly or indirectly*** targeting youths in tobacco product advertising.

9.      The Altria Defendants also knew by December 2018 that JUUL's massive market share was largely comprised of youths, and that various governmental authorities, including the U.S. Food and Drug Administration ("FDA") which is responsible for the regulation of tobacco products, had become increasingly concerned with what the agency deemed an "epidemic" of vaping by youth.  In addition, numerous class and individual lawsuits claiming physical damage from vaping were already filed at the time.

10.     ***Yet, notwithstanding JUUL's long history of targeting youth, on December 20, 2018, Altria announced it acquired $12.8 billion worth of JUUL's stock*** pursuant to a stock purchase agreement ("SPA").  This amounted to a 35% interest in JUUL.   Altria estimated the value of JUUL to be approximately $38 billion.

11.     As part of Altria's investment, Altria issued JUUL a $2 billion payment that JUUL distributed as bonuses to its employees.

12.     Under the Relationship Agreement ("RA") executed by the parties, Altria agreed not to sell or transfer any of its JUUL shares for six years after the SPA.  In addition, Altria agreed

---

[2] The Altria Defendants are Defendants William F. Gifford, Jr., Howard A. Willard III, John T. Casteen III, Dinyar S. Devitre, Thomas F. Farrell II, Debra J. Kelly-Ennis, W. Leo Kiely III, Kathryn B. Mcquade, George Muñoz, Mark E. Newman, Nabil Y. Sakkab, Virginia E. Shanks, Ellen R. Strahlman, and Kevin C. Crosthwaite, Jr.

in the RA not to compete with JUUL in the e-vapor business.

13.     The parties also executed a Service Agreement ("SA"), under which Altria would provide marketing services for JUUL such as obtaining access for JUUL products in the Company's retail shelf space (in retail outlets such as gas stations) and directly communicating with smokers through cigarette pack inserts and mailings to smokers in Altria's customer databases.  Altria also pledged to provide logistical and distribution support for JUUL products.

14.     Altria and JUUL also entered into an Intellectual Property License Agreement, licensing Altria's e-cigarette intellectual property to JUUL, as well as a Voting Agreement, providing Altria with the right to appoint three voting members to JUUL's board of directors following antitrust approval of Altria's investment.

15.     As detailed herein, these agreements with JUUL have been economically disastrous for Altria. ***The Company has since written off the value of its JUUL investment three times in less than two years, and its $12.8 billion investment is now estimated by Altria to be worth $1.6 billion, a decrease of almost 90% from the value Altria gave to JUUL at the time of the investment***.  Similarly, media reports have stated that JUUL cut its valuation to $10 billion, a drop of $28 billion   more than 70%   from Altria's estimated valuation of JUUL of $38 billion in December 2018.  The price of Altria's common stock has declined by approximately 20% since the JUUL investment.

16.     Additionally, from the date Altria announced it acquisition of JUUL stock on December 20, 2018, through the present (the "Relevant Period"), the Altria Defendants made and allowed others to make materially false and misleading statements and omissions to investors and stockholders in connection with the Company's investment in JUUL.

17.     The misconduct surrounding Altria's investment in JUUL has created massive

litigation risks and expenses for Altria, in addition to Altria's more than $10 billion writedown of the investment.  There are presently approximately 1,145 separate lawsuits related to e-cigarettes pending against the Company, as well as the Securities Action, which alleges the Company and certain of its executives made false and misleading statements and omissions under the Exchange Act.  Many of the product liability and marketing sales practice actions against JUUL have been consolidated into a multi-district litigation.  *In re Juul Labs, Inc. Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 19-md-2913-WHO (N.D. Cal.).  In addition, the U.S. Federal Trade Commission ("FTC") has filed an administrative complaint against Altria and JUUL (*In re Altria Grp., Inc., et al.*, Docket No. 9393) alleging the SPA and its accompanying agreements violated Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.  The complaint alleged that "Altria's investment in J[UUL] and its nearly simultaneous decision to exit the relevant market in order to meet J[UUL]'s demands not only eliminated its existing e-cigarette products from the market but also, through the Non-Compete [in the Relationship Agreement], halted its ongoing innovation efforts toward developing a new and improved portfolio of products."  There are also numerous private antitrust and other class actions pending against the Company.  *See, e.g., In re JUUL Labs, Inc. Antitrust Litig.*, No. 20-cv-02345-WHO (N.D. Cal.).

18.     Altria's annual report for 2019, on Form 10-K, filed with the U.S. Securities and Exchange Commission ("SEC") on February 25, 2020, disclosed that "the SEC has commenced an investigation relating to Altria's disclosures and controls in connection with the JUUL investment."

19.     Altria's investment in JUUL would not have occurred but for breaches of the fiduciary duties of loyalty, good faith, candor, and due care by the Altria Defendants.  Specifically,

they knew, consciously disregarded, or was reckless in not knowing that:

(a)     JUUL's marketing was directed towards adolescents and young adults;

(b)     JUUL's products were harmful and not a tobacco cessation product;

(c)     JUUL's youth marketing scheme subjected Altria, and Altria's investment in JUUL, to material risks and expenses, including reputational, litigation and regulatory actions and fines;

(d)     the value of JUUL was significantly overstated and severe regulatory and litigation risks would negatively impact both the value of JUUL and the Company;

(e)     the risks associated with JUUL's products and marketing practices, and the true value of JUUL and its products were known to the Altria Defendants but were not communicated to Altria investors;

(f)     all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JUUL in particular made it reasonably likely that Altria's investment in JUUL would negatively affect Altria's reputation and operations;

(g)     Altria's agreements with JUUL violated antitrust laws; and

(h)     the materialization of these risks would likely require Altria to write-down a material portion of its investment in JUUL and expose the Company to massive additional liability.

20.     JUUL and its directors and officers named herein as defendants (the "JUUL Defendants")[3] knowingly participated in the Board's breaches of its fiduciary duties and aided and abetted those breaches.

21.     For these reasons, on December 10, 2020, Plaintiff made a demand (the "Demand") on the Company and the Board pursuant to Va. Code Ann. § 13.1-672.1(B)(1) to investigate and commence legal proceedings against the individuals responsible for the wrongdoing above. (A copy of the Demand is attached hereto as Exhibit A and is incorporated by reference).

22.     On March 4, 2021, the Board responded to Plaintiff's Demand, stating in full:

---

[3] The JUUL Defendants are Defendants Adam Bowen, Kevin Burns, James Monsees, Riaz Valani, Nicholas J. Pritzker, and Juul Labs, Inc.

The Altria board has authorized this response to your client's December 4 and 10 letters. ***The board is familiar with the history and current status of Altria's investment in JUUL*** and, as part of its inquiry regarding the matters raised in your letters, will continue to be actively engaged in monitoring and overseeing that investment. The board is also actively engaged in monitoring and overseeing the FTC, securities and other litigation referenced in your letters, as well as the ongoing government inquiries concerning JUUL and e-vapor products generally.

The Altria board believes that it is in the best interests of Altria to defend itself in these proceedings, which are at a very preliminary stage. ***After there have been further developments, the board will make a timely and appropriate determination on the matters raised by your letters***, and that determination will promptly be communicated to you. In any event, we will update you once there is a decision on the motion to dismiss the securities litigation.

(Emphasis added.)  (A copy of the Board's March 4, 2021 response to the Demand is attached hereto as Exhibit B and is incorporated by reference.)

23.     The Board's March 4, 2021 letter constitutes a refusal to Plaintiff's Demand. ***The letter makes clear that the Board will not consider or respond to Plaintiff's Demand at this time or at any ascertainable time in the future***. Specifically, the Board will not consider or make a determination on the Demand until "[a]fter there have been further developments" in the other unspecified litigations. Not only is the Board's response a blatant refusal of Plaintiff's lawful Demand, it is also yet another concerning indication that the Board fails to uphold its obligations to the Company and its shareholders.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) and Rule 10b-5 of the Exchange Act.  Also, this Court has subject matter jurisdiction under diversity of citizenship and amount in controversy under 28 U.S. Code § 1332.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Indeed, alternatively, jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

28.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

29.     Altria is incorporated and headquartered in the Commonwealth of Virginia.

30.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Altria, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

*Plaintiff*

31.     Plaintiff was a shareholder of Altria at the time of the misconduct complained of herein and has been a shareholder of Altria continuously since that time. Plaintiff is a citizen of the State of South Carolina.

*Nominal Defendant*

32.     Nominal defendant Altria is a Virginia corporation with its principal executive offices located at 6601 West Broad Street, Richmond, Virginia 23230.

*Defendants*

33.     Defendant William F. Gifford, Jr. ("Gifford") has served as Chief Executive Officer ("CEO") and a director of the Company since April 2020.  Gifford served as Vice Chairman and Chief Financial Officer ("CFO") of the Company from May 2018 until April 2020.  Gifford is a member of the Executive Committee.  In 2019, Gifford received $9,373,759 in total compensation from the Company.  Gifford is a citizen of Virginia.

34.     Defendant Howard A. Willard III ("Willard") served as CEO of the Company and Chairman of the Board from May 2018 until April 2020.  Willard also served as Executive Vice President and Chief Operating Officer of the Company from March 2015 until May 2018 and as Executive Vice President and CFO from January 2011 until February 2015.  In 2019, Willard received $15,417,616 in total compensation from the Company.  Willard is a citizen of Virginia.

35.     Defendant John T. Casteen III ("Casteen") has served as a director of the Company since 2010.  Casteen is a member of the Audit, Compensation and Talent Development, and Innovation Committees.  In 2019, Casteen received $317,260 in total compensation from the Company. Casteen is a citizen of Virginia.

36.     Defendant Dinyar S. Devitre ("Devitre") has served as a director of the Company since 2008.  Divitre served as Senior Vice President and CFO of Altria from 2002 until 2008. Divitre is Chair of the Finance Committee and a member of the Executive, Innovation, and Nominating, Corporate Governance, and Social Responsibility Committees.  In 2019, Devitre received $344,805 in total compensation from the Company.  Devitre is a citizen of New York.

37.     Defendant Thomas F. Farrell II ("Farrell") has served as a director of the Company since 2008 and has served as Chairman of the Board since April 2020.  Farrell is Chair of the Executive Committee and a member of the Compensation and Talent Development and Nominating, Corporate Governance, and Social Responsibility Committees.  In 2019, Farrell received $320,010 in total compensation from the Company.  Farrell is a citizen of Virginia.

38.     Defendant Debra J. Kelly-Ennis ("Kelly-Ennis") has served as a director of the Company since 2013.  Kelly-Ennis is a member of the Audit, Innovation, and Nominating, Corporate Governance, and Social Responsibility Committees.  In 2019, Kelly-Ennis received $314,260 in total compensation from the Company.  Kelly-Ennis is a citizen of Canada.

39.     Defendant W. Leo Kiely III ("Kiely") has served as a director of the Company since 2011.  Kiely is Chair of the Compensation and Talent Development Committee and a member of the Executive, Finance, and Innovation Committees.  In 2019, Kiely received $355,010 in total compensation from the Company.  Kiely is a citizen of Illinois.

40.     Defendant Kathryn B. McQuade ("McQuade") has served as a director of the Company since 2012.  McQuade is Chair of the Nominating, Corporate Governance, and Social Responsibility Committee and a member of the Audit, Compensation and Talent Development, and Executive Committees.  In 2019, McQuade received $345,010 in total compensation from the Company.  McQuade is a citizen of Nevada.

41.     Defendant George Muñoz ("Muñoz") has served as a director of the Company since 2004.  Muñoz is Chair of the Audit Committee and a member of the Executive, Finance and Nominating, Corporate Governance, and Social Responsibility Committees.  In 2019, Muñoz received $355,010 in total compensation from the Company.  Muñoz is a citizen of Illinois.

42.     Defendant Mark E. Newman ("Newman") has served as a director of the Company

since 2018. Newman is a member of the Audit, Finance, and Innovation Committees.   In 2019, Newman received $330,010 in total compensation from the Company.  Newman is a citizen of Delaware.

43.     Defendant Nabil Y. Sakkab ("Sakkab") has served as a director of the Company since 2008. Sakkab is Chair of the Innovation Committee and a member of the Executive, Finance, and Nominating, Corporate Governance, and Social Responsibility Committees. In 2019, Sakkab received $315,010 in total compensation from the Company.  Sakkab is a citizen of Nevada.

44.     Defendant Virginia E. Shanks ("Shanks") has served as a director of the Company since 2017. Shanks is a member of the Audit, Compensation and Talent Development, and Innovation Committees.   In 2019, Shanks received $319,980 in total compensation from the Company. Shanks is a citizen of Nevada.

45.     Defendant Ellen R. Strahlman ("Strahlman") has served as a director of the Company since November 2020. Strahlman is a citizen of Florida.

46.     Defendant Kevin C. Crosthwaite, Jr. ("Crosthwaite") served as Senior Vice President, Chief Strategy and Growth Officer, of the Company from June 2018 until September 2019, when he became the CEO of JUUL.   In 2019, Crosthwaite received $7,695,367 in total compensation from the Company.  Crosthwaite is a citizen of Virginia.

47.     Defendant JUUL is a Delaware corporation with its principal executive offices located at 560 20th Street, San Francisco, California 94107.

48.     Defendant Adam Bowen ("Bowen") co-founded JUUL with Defendant Ames Monsees ("Monsees") and is JUUL's Chief Technology Officer. "Following the writedown [of Altria's investment], Forbes no longer considers the cofounders to be billionaires."[4]  Bowen is a

---

[4] Forbes, Profile – Adam Bowen, available at https://www.forbes.com/profile/adam-bowen/?sh=5d5a94723dd (last

citizen of California.

49.     Defendant Kevin Burns ("Burns") served as CEO of JUUL from December 2017 until September 2019 and a director from July 2018 until September 2019. Burns is a citizen of California.

50.     Defendant Monsees co-founded JUUL with Bowen and is JUUL's Chief Product Officer. "Following the writedown [of Altria's investment], Forbes no longer considers the cofounders to be billionaires."[5] Monsees is a citizen of California.

51.     Defendant Riaz Valani ("Valani") has served as a director of JUUL since May 2011. Valani is a citizen of California.

52.     Defendant Nicholas J. Pritzker ("Pritzker") has served as a director of JUUL since 2015. Pritzker is a citizen of California.

53.     The defendants identified in ¶¶ 30-43 are referred to herein as the "Altria Defendants."

54.     The defendants identified in ¶¶ 44-49 are referred to herein as the "JUUL Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

55.     Under Virginia law, corporate officers, including directors, have the same duties of fidelity in dealing with the corporation that arise in dealings between a trustee and a beneficiary of the trust. For example, they must refrain from self-dealing or fraud or acting in bad faith.

56.     By reason of their positions as officers, directors, and/or fiduciaries of Altria and because of their ability to control the business and corporate affairs of the Company, at all relevant

---

accessed March 11, 2021).

[5] Forbes, Profile   Ames Monsees, available at https://www.forbes.com/profile/james-monsees/?sh=5eedfb07526b (last accessed March 11, 2021).

times, the Altria Defendants owed Altria and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Altria Defendants were required to act in furtherance of the best interests of Altria and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Altria and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

57.  The Altria Defendants, because of their positions of control and authority as directors and/or officers of Altria, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Altria, each of the Altria Defendants had knowledge of material non-public information regarding the Company.  To discharge their duties, the officers and directors of Altria were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Altria were required to, among other things:

(a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable district and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

58.     The Altria Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Altria.

59.     Each of the Altria Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Altria Defendants and the JUUL Defendants.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Altria Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Altria Defendants caused the Company to conceal the true facts as alleged herein. The Altria Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Altria Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

62.     The Altria Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Altria Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Altria Defendants, who are directors of Altria, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Altria Defendants and the JUUL Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Altria Defendants was the agent of each of the other Altria Defendants and of Altria and was at all times acting within the course and scope of such agency.

### ALTRIA'S CODES OF CONDUCT

65.     The first substantive item in the Company's Code of Conduct is a letter from the CEO, defendant Gifford, which states:

> This is a dynamic time for Altria and its companies. As the leader in an evolving industry, we have the duty and the opportunity to shape a better future for our adult consumers, employees and shareholders. Our future success requires that we continue to run our businesses responsibly and in compliance with all applicable laws, always holding ourselves to high standards of integrity. All of us must focus on compliance and integrity in our daily work. Our Code is a framework for operating with integrity, providing guidance for how we work and how we behave. It directs us to ask before acting:
>
> • Is it legal?
>
> • Does it follow company policy?
>
> • Is it the right thing to do?
>
> • How would it look to those inside and outside the company?
>
> Our policies and related documents complement the Code with details of how we should execute our work. Each of us is responsible for understanding how all these elements relate to our roles at Altria.
>
> …Big problems can be prevented… if someone raises their hand and identifies the issue early, so it can be addressed. I support you in that. Speak up. Looking the other way or thinking that it's "not my problem" is a violation of our Code, our policies, and it puts our companies at risk.

66.     In answering the question, "Why Do We Have a Code?" the Code of Conduct states: "Our Code introduces us to many important laws, policies and procedures we must follow[;] It shows us how to spot potential issues in our work[; and] It identifies resources when we need more information, want advice or wish to report concerns."

67.     In answering the question, "Who Must Follow Our Code?" the Code of Conduct states: "Our Code applies to all employees, including senior management and officers, who work for Altria's companies." The Code of Conduct, by its own terms, therefore applies to the Altria Defendants as directors and officers.

68.     The Code of Conduct identifies a "Duty to Speak Up" when, for instance, "misconduct has taken place or is about to take place."

69.     In answering the question, "What Happens When a Compliance Violation Occurs?" the Code of Conduct states: "Those who fail to follow our Code, policies or procedures are subject to disciplinary action. At a minimum, this means counseling, but it could include termination of employment. Certain compliance violations may also subject the offenders to civil or criminal prosecution."

70.     With regard to fiscal compliance, asset management and cash management principles, the Code of Conduct states that employees must "Conduct business consistent with fiscal controls, company policies and applicable laws" and "[p]rotect and safeguard company assets."

71.     On a page titled "Business Partner Due Diligence," the Code of Conduct states: "[w]e want to do business with firms or individuals that conduct business with integrity and in compliance with all applicable laws. Consult company policies for standards on selecting and approving customers and other business partners. At a minimum, you should: [a]ssess and, where

appropriate, confirm that the parties you're working with maintain a genuine business presence and are engaged in legitimate trade [and] [c]ommunicate your company's compliance expectations and be alert to your business partners' practices."

72.     On a page titled "Accurate Books and Records, and Financial Disclosure," the Code of Conduct states: "Altria and its companies are committed to providing complete, accurate and timely information, in all material respects, about their financial condition and business results." The Code of Code further states that, ***"[s]enior financial officers and other managers responsible for accurate books, records, accounting and disclosure of financial information have a special duty to meet these standards***, including establishing internal controls in their areas of responsibility to prevent and detect unauthorized, unrecorded or inaccurately recorded transactions." (Emphasis added.)

73.     On the subject of insider trading, the Code of Conduct states:

Many of us may have inside information simply by virtue of our position. Securities laws make it illegal for those with material inside information about a company to buy or sell its securities (stocks, bonds, options, etc.). Never trade based on material inside information about our companies or any customer, supplier or other company.

Material inside information refers to non-public information that a reasonable investor would likely consider important in deciding whether to buy or sell a security. Chances are, if something leads you to want to buy or sell stock, the information may be material. Information about plans to do or not do something also may be material inside information.

Material inside information might include:

- Financial information, including earnings, forecasts, dividends and financing

- Significant business developments, including volume and share, significant product or contract information, and acquisitions or joint ventures

- Major developments in litigation or government actions

- Non-public information about another company, customer or supplier

If you have inside information, you may not trade until the information is made

public through established channels and enough time has passed for the information to be absorbed by the public. Certain employees who have regular access to inside information generally must limit their trading of company securities to specified "window periods." However, even trading in these window periods is prohibited if you possess material inside information.

74.     In the context of antitrust compliance, the Code of Conduct states: "[o]ur companies must comply with the laws that promote competition and protect trade secrets.  We must avoid business activities or conduct that would unlawfully restrict competition.  We must not misuse others' trade secrets or proprietary information."

75.     In relaying its "communications principle," the Code of Conduct states: "[o]ur companies are committed to communicating clear, accurate, timely, appropriate and substantiated information about our businesses."  The Code of Conduct further states:

> Our communications with stakeholders about our business should be clear and honest. To that end, our communications should only contain information that is approved for external use. Be careful not to discuss topics in a way that is inconsistent with our companies' positions and actions.

> It is important that we provide reliable information about our operations, positions, policies, practices, performance and outlook. Only Designated Spokespersons may communicate on behalf of our companies with the investment community or the media without prior approval. This includes online communications and social media. The messages and means of communicating externally must be approved in advance.

76.     In discussing the Company's "product communication principle," the Code of Conduct states:

> Our companies will responsibly provide information that helps the intended audience in making informed decisions regarding the purchase and use of their products, in compliance with all applicable laws.

> Our companies are committed to responsibly marketing our products to adult consumers. To support this goal, you must:

> - Ensure that marketing materials and programs comply with all legal requirements, our Code, policies, practices and commitments

> - Hold advertising agencies and product development and marketing consultants to these standards

- Never make misrepresentations about our companies' products, including the health effects of those products

- Substantiate all claims about our companies' products before you make any claims

- ***Never market our companies' products to underage persons***

(Emphasis added.)

77.     In discussing the Company's "product regulatory and quality principal," the Code of Conduct states: "[o]ur companies are committed to providing superior branded products that meet applicable legal and regulatory requirements and consumer expectations.  We are committed to meeting all applicable legal, regulatory and product quality requirements.  We must all notify appropriate responsible employee(s) about any potential legal, regulatory or quality issues."  The Code of Conduct states further that: "[e]very day, our companies' reputations for regulatory compliance and quality are in our hands."

## SUBSTANTIVE ALLEGATIONS

78.     Over the last century, Altria and the tobacco industry have made billions of dollars through aggressive marketing campaigns in film, television, and print that failed to warn of the harmful effects of nicotine and cigarettes.  This marketing campaign created the false impression that e-cigarettes were safe, yet left millions of Americans unwittingly addicted to nicotine, caused hundreds of thousands of deaths and illnesses due to lung cancer, lung disease and cardiovascular issues, and led to immeasurable human suffering.

79.     In 1998, 46 state attorneys general entered into the Tobacco Master Settlement Agreement ("MSA"),[6] which prohibits Altria and the other major cigarette companies from marketing and advertising their products to youth ("persons under 18 years of age") and sets forth

---

[6] The MSA is incorporated by reference herein and can be found at the following link: https://1li23g1as25g1r8so11ozniw-wpengine.netdna-ssl.com/wp-content/uploads/2020/09/MSA.pdf.

specific prohibited acts, such as use of cartoon characters and billboards near school grounds. The implementation of the MSA's marketing restrictions in the late 1990s, combined with public health and public policy efforts inspired or funded by the MSA, disclosure of documents relating to Big Tobacco's wrongdoing, and subsequent litigation enforcing the MSA, contributed to dramatic declines in tobacco use, including among youth.

80.     The MSA, which specifically includes smokeless tobacco products[7] like JUUL's e-cigarettes (and that was executed by Altria subsidiary Philip Morris USA),[8] permanently prohibits Altria from targeting tobacco products to children:

III.    **PREMANENT RELIEF**

(a) <u>Prohibition of Youth Targeting</u>. ***No participating Manufacturer may take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products***, or take any action the primary purpose of which is to initiate, maintain, or increase the incidence of Youth smoking within any Settling State.

(Emphasis added.)

81.     In addition to the general prohibition against targeting youth, the MSA enumerates specific examples of the types of advertising and promotion that is prohibited. This includes, *inter alia*, (i) a ban on the use of cartoons, (ii) limitations on brand name sponsorships (such as concerts, certain sporting events, and other events that where a significant percentage of attendees are youth); (iii) a prohibition on sponsoring teams and leagues; (iv) the elimination of outdoor and transit advertisements; (v) the removal of certain media-based advertisements; and (vi) bans on youth access to free samples and gifts to underage persons based on proofs or purchase.

82.     In 2009, the FDA banned the sale of flavored cigarettes other than menthol

---

[7] Section "(vv)" of the MSA (p. 17) defines "Tobacco Products" as "Cigarettes and ***smokeless tobacco products***." (Emphasis added.)

[8] "Philip Morris Incorporated" is a signatory to the MSA and is a predecessor company to Philip Morris USA.

anywhere in the United States, in any form. The restriction did not apply to vaping devices, because they did not exist at the time.

83.     The 2010 implementation of the Family Smoking Prevention and Tobacco Control Act ("Tobacco Control Act") provides the FDA with authority over all products made or derived from tobacco.

84.     By June 2014, teen smoking hit record lows and the Centers for Disease Control and Prevention ("CDC") reported that "in achieving a teen smoking rate of 15.7 percent, the United States has met its national Healthy People 2020 objective of reducing adolescent cigarette use to 16 percent or less." The U.S. Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free." But where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, JUUL saw an opportunity.

85.     JUUL is an American electronic cigarette company that began manufacturing and selling the JUUL e-cigarette in 2015. The JUUL e-cigarette uses nicotine salts from leaf tobacco in one-time use cartridges or "pods" that are heated, resulting in the vapor inhaled by the user.

86.     JUUL's products were originally designed for and have at all times been marketed towards minors and young adults. The JUUL e-cigarette resembles a harmless flash-drive (making it easy for children and young adults to conceal from parents and educators) and contains nicotine cartridge flavors (e.g., mango, crème brûlée, and mixed fruit) that cigarette companies are prohibited from marketing precisely because the flavors appeal to minors.

87.     It was obvious that JUUL's purported mission of "switching adult smokers" to

JUUL devices was false and misleading. Instead, JUUL's unspoken goal was to achieve growth through repeated sales of an addictive and harmful product to minors as well as young adults.

88.     JUUL's attempt to characterize its activities as merely "switching adult smokers" is further belied by that company's repeated comparisons of its vaping pods to traditional tobacco products. For example, prior to JUUL's release in June 2015 PAX (JUUL's original name) released information from a "commissioned study" that compared JUUL's blood nicotine levels to traditional combustion cigarettes and other e-cigarettes, as set forth in the following chart from JUUL's website in 2015:



89.     In other words, rather than undertake efforts to create and promote a smoking cessation product to prevent nicotine addiction, JUUL was apparently more focused on the "nicotine concentration" of its products relative to cigarettes and "average e-cigarettes," presumably in an effort to gain a market advantage.

90.     At the same time, however, JUUL sought to distinguish its products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For

example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[9]  JUUL even took this message to ninth graders.  As cited in an FDA Warning Letter sent to JUUL on September 9, 2019, in 2018, a representative from JUUL spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that JUUL was "totally safe," that JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[10]

91.     Cigarette companies have known for decades that flavored products are key to getting young people to begin using nicotine and become addicted.  Accordingly, in June 2015, JUUL began marketing its e-cigarettes in four flavors including tabaac (later renamed "tobacco"), fruut (later renamed "fruit medley"), bruulé (later renamed "crème brulee"), and miint (later renamed "mint").  As described above, the FDA banned flavored cigarettes (other than menthol) in 2009 as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009.

92.     JUUL's aggressive and illegal marketing strategy worked, with JUUL becoming the biggest manufacturer and distributor of electronic vapor and electronic cigarettes products in the United States.  According to the FTC's complaint, by 2018, JUUL controlled approximately 70% of the e-cigarette market.

93.     The nature and extent of JUUL's youth advertising and promotional efforts –

---

[9] FDA Warning Letter to JUUL Labs, (September 9, 2019), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/juul-labs-inc-590950-09092019.

[10] *Id.*

particularly with respect to online and outdoor advertising[11] – were extensively described in a study by Stanford University School of Medicine ("Stanford") published in January 2019 (the "Stanford Study").[12]  The Stanford Study attempted to catalogue, from June 2015 to November 2018, JUUL's youth advertising and promotional efforts.  By way of example, Stanford identified 2,691 Twitter, 248 Facebook, 187 Instagram post, and 171 directed marketing.  Stanford at 1.  Additionally, during this time JUUL's Instagram account had 77,600 postings and #juul (on Twitter) had 260,866 postings.  *Id*.  The Stanford Study noted:

> JUUL's vaporized launch campaign featured models in their 20s appearing in trendy clothes engaged in poses and movements more evocative of underage teens than mature adults.  Subsequently, JUUL's principal advertising themes have been closely aligned with that of traditional tobacco advertising (pleasure/relaxation, socialization/romance, flavors, cost savings/discounts, holidays/seasons, style/identity, and satisfaction).  Advertising prominently featured sweet and fruity flavors, especially mango.  The company employed social media influencers as brand ambassadors.  They also sought individuals who were popular on the internet, enrolled them in JUUL's affiliate program, and compensated them for posting positive reviews while insisting they not reveal this relationship.

*Id*.

94.    The study concluded that "JUUL's advertising imagery in its first 6 months on the market was patently youth oriented.  For the next 2.5 years it was more muted, but the company's advertising was widely distributed on social media channels frequented by youth, was amplified by hashtag extensions, and catalyzed by compensated influencers and affiliates."  *Id*.  By any measure, if Stanford researchers managed to locate these publicly available examples of JUUL's targeting of youth with its advertising during the years 2015 to 2018, Altria's board could have readily done the same.

---

[11] In 2015 JUUL had video advertisements in New York City's Times Square.  Stanford at 18.

[12] Jackler, Robert K. and Cindy Chau.  "JUUL Advertising Over its First Three Years on the Market."  Stanford University School of Medicine, Jan. 31, 2019.  Cited herein as "Stanford at __."  The Stanford study is fully incorporated by reference.

95.     Against this backdrop, prior to the Company's investment in JUUL, the Altria

Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     JUUL's marketing was directed towards adolescents and young adults in violation
of the MSA;

(b)     JUUL's products were harmful and not a tobacco cessation product – indeed, quite
the opposite   throughout its history JUUL often compared its smokeless pod products to
traditional tobacco products;

(c)     JUUL's youth marketing scheme subjected Altria, and Altria's investment in
JUUL, to material risks and expenses, including reputational, litigation and regulatory
actions and fines;

(d)     The value of JUUL was significantly overstated and severe regulatory and litigation
risks would negatively impact both the value of JUUL and the Company;

(e)     The risks associated with JUUL's products and marketing practices, and the true
value of JUUL and its products were known to the Altria Defendants but were not
communicated to Altria investors;

(f)     all of the foregoing, as well as mounting public scrutiny, negative publicity, and
governmental pressure on e-vapor products and JUUL in particular made it reasonably
likely that Altria's investment in JUUL would negatively affect Altria's reputation and
operations;

(g)     Altria's agreements with JUUL violated antitrust laws; and

(h)     the materialization of these risks would likely require Altria to write-down a
material portion of its investment in JUUL and expose the Company to massive additional
liability.

96.     Indeed, had the Altria Defendants reviewed JUUL advertising and marketing

practices, even in a cursory manner, they would have known that JUUL was targeting youths.

97.     Further, sufficient due diligence also would have revealed to the Altria Defendants

that JUUL's market share was largely comprised of youths, not adults.

98.     Additionally, reports of JUUL's successful marketing to minors emerged and were

public knowledge long before Altria signed and closed its investment in JUUL.  For instance:

(i)     On December 4, 2017, *National Public Radio* detailed JUUL's widespread
popularity among teens and young adults, titled "Teenagers Embrace JUUL, Saying It's
Discreet Enough to Vape in Class."  The article quotes an eighteen-year-old student who

stated that as much as 60% of her friends have a JUUL.  The article also links the spike in youth use to JUUL's design and flavors, stating: "The JUUL device, with its sleek design that resembles a flash drive is a special hit with teens. … The JUUL also has multiple flavors available    mint, tobacco, mango, crème brulee and fruit."  Further, in November 2018, the CDC reported that current e-cigarette use among American high school students reached 20.8%, representing a 78% increase from the prior year.

(ii)      On May 7, 2018, the New Yorker published an article titled "The Promise of Vaping and the Rise of Juul," which stated, among other things, that "Teens have taken a technology that was supposed to help grownups stop smoking and invented a new kind of bad habit, molded in their own image."[13]

(iii)      On October 2, 2018, the CDC published a press release titled "Sales of JUUL e-cigarettes skyrocket, posing danger to youth" that stated, "[s]ales of JUUL, an e-cigarette shaped like a USB flash drive, grew more than seven-fold from 2016 to 2017…[and] [u]se of JUUL by youth in schools, including in classrooms and bathrooms, has been widely reported."  The press release quoted Robert Redfield, M.D., director of CDC, as saying "[t]he popularity of JUUL among kids threatens our progress in reducing youth e-cigarette use,' [and] '[w]e are alarmed that these new high nicotine content e-cigarettes, marketed and sold in kid-friendly flavors, are so appealing to our nation's young people."[14]

(iv)      A Truth Initiative study published on October 18, 2018 in Tobacco Control (an international peer-reviewed research journal) found that "15- to 17-year-olds have over 16 times greater odds to be current JUUL users compared to those aged 25-34."  The study noted that "[t]hese high rates are consistent with a recent announcement from the Food and Drug Administration Commissioner Scott Gottlieb, who declared that e-cigarette use reached 'nothing short of an epidemic proportion of growth,' and cited new, unpublished federal data that anticipate a 77 percent increase in e-cigarette use among high school students as compared to 2017."[15]

(v)      On November 16, 2018, *Forbes* published an article citing Dr. Robert Jackler, the cofounder of a group called Stanford Research Into the Impact of Tobacco Advertising, a Stanford University-affiliated program, who stated JUUL's "marketing clearly appealed to youth, most overtly from mid-2015 to 2016, the year following Juul's launch.  His archived Juul ads are filled with attractive young models socializing and flirtatiously sharing the flash-drive shaped device, displaying behavior like dancing to club-like music and clothing styles more characteristic of teens than mature adults."[16]

---

[13] Jia Tolentino, *The Promise of Vaping and the Rise of Juul*, The New Yorker (May 7, 2018).

[14] CDC, Sales of JUUL e-cigarettes skyrocket, posing danger to youth (Oct. 2, 2018) available at https://www.cdc.gov/media/releases/2018/p1002-e-Cigarettes-sales-danger-youth.html.

[15] Truth Initiative, New Study Reveals Teens 16 Times More Likely to Use JUUL than Older Age Groups (Oct. 18, 2018) available at https://truthinitiative.org/sites/default/files/media/files/2019/03/Study-Reveals-Teens-16-Times-More-Likely-to-Use-JUUL-than-Older-Age-Groups.pdf.

[16] Kathleen Chaykowski, The Disturbing Focus Of Juul's Early Marketing Campaigns, Forbes (Nov. 16, 2018), available at https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/?sh=339abc6814f9.

99.     Altria and the Altria Defendants also had longstanding institutional knowledge of and indeed previously participated in these predatory marketing techniques through Altria's own marketing of e-cigarettes.  The Altria Defendants knew or should have known that JUUL was responsible for this increase in light of JUUL's admitted rapid growth, impressive market share, and leadership in the e-vapor category.

100.    On May 10, 2016, the FDA issued a final rule, effective August 8, 2016, that regulated vaping products by including them in the statutory definition of "tobacco product," making them subject to the Federal Food, Drug, and Cosmetic Act (the "FD&C Act"), as amended by the Family Smoking Prevention and Tobacco Control Act.

101.    On July 27, 2017, the FDA announced a "comprehensive regulatory plan to shift trajectory of tobacco-related disease, death."  Among other things, the statement disclosed:

> Importantly, the anticipated new enforcement policy will not affect any current requirements for cigarettes and smokeless tobacco, only the newly-regulated tobacco products such as cigars and e-cigarettes. This approach also will not apply to provisions of the final rule for which compliance deadlines already have passed, such as mandatory age and photo-ID checks to prevent illegal sales to minors. It also will not affect future deadlines for other provisions of the rule, including, but not limited to, required warning statements, ingredient listing, health document submissions, harmful and potentially harmful constituent reports, and the removal of modified risk claims, i.e., "light," "low," or "mild," or similar descriptors.

> In order to further explore how best to protect public health in the evolving tobacco marketplace, the agency also will seek input from the public on a variety of significant topics, including approaches to regulating kid-appealing flavors in e-cigarettes and cigars. In particular, the FDA intends to issue ANPRMs [Advance Notices of Proposed Rule Making] to: 1) seek public comment on the role that flavors (including menthol) in tobacco products play in attracting youth and may play in helping some smokers switch to potentially less harmful forms of nicotine delivery . . . .

102.    On April 23, 2018, Dr. Scott Gottlieb ("Gottlieb"), the FDA Commissioner at the time, issued a statement "on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes."  The statement noted:

The troubling reality is that electronic nicotine delivery systems (ENDS) such as e-cigarettes have become wildly popular with kids. We understand, by all accounts, many of them may be using products that closely resemble a USB flash drive, have high levels of nicotine and emissions that are hard to see. ***These characteristics may facilitate youth use, by making the products more attractive to children and teens.***

These products are also more difficult for parents and teachers to recognize or detect. ***Several of these products fall under the JUUL brand***, but other brands, such as myblu and KandyPens, that have similar characteristics are emerging. In some cases, our kids are trying these products and liking them without even knowing they contain nicotine. And that's a problem, because as we know the nicotine in these products can rewire an adolescent's brain, leading to years of addiction. For this reason, ***the FDA must – and will – move quickly to reverse these disturbing trends, and, in particular, address the surging youth uptake of JUUL and other products***.

To address all of these concerns, the FDA is announcing a series of new enforcement and regulatory steps.

First, we're announcing that the FDA has been conducting a large-scale, undercover nationwide blitz to crack down on the sale of e-cigarettes ***specifically JUUL products*** – to minors at both brick-and-mortar and online retailers. The blitz, which started April 6 and will continue to the end of the month, has already revealed numerous violations of the law.

***The illegal sale of these JUUL products to minors is concerning***. In fact, just since the beginning of March, FDA compliance checks have uncovered 40 violations for illegal sales of JUUL products to youth. The FDA has issued 40 warning letters for those violations, which we are also announcing today. This includes warning letters that are the result of the blitz. Others are a result of our sustained enforcement efforts to reduce tobacco product sales to minors. And we anticipate taking many more similar actions as a result of the ongoing blitz and our focus on enforcement related to youth access.

\*\*\*

Second, as part of this effort, we also recently contacted eBay to raise concerns over several listings for JUUL products on its website. We're thankful for eBay's swift action to remove the listings and voluntarily implement new measures to prevent new listings from being posted to the web retailer's site. Our overarching goal – one we hope everyone shares   is to make sure JUUL, and any other e-cigarettes or tobacco products, aren't getting into kids' hands in the first place.

***Third, we're also taking additional steps to contact the manufacturers directly, and hold them accountable***. We need to examine all the available information to understand why kids are finding these products so appealing   and address it.

***That's why today, the FDA also sent an official request for information directly to JUUL Labs, requiring the company to submit important documents to better understand the reportedly high rates of youth use and the particular youth appeal***

*of these products*. The information we're requesting includes: documents related to product marketing; research on the health, toxicological, behavioral or physiologic effects of the products, including youth initiation and use; whether certain product design features, ingredients or specifications appeal to different age groups; and youth-related adverse events and consumer complaints associated with the products. We don't yet fully understand why these products are so popular among youth. But it's imperative that we figure it out, and fast. These documents may help us get there.

We plan to issue additional letters to other manufacturers of products that raise similar concerns about youth use. If these companies, including JUUL, don't comply with our requests, they will be in violation of the law and subject to enforcement.

Fourth, we are planning additional enforcement actions focused on companies that we think are marketing products in ways that are misleading to kids. I will have more to say on this in the coming weeks.

(Emphasis added.)

103.   The next day, April 24, 2018, the FDA's Director, Office of Science Center for Tobacco Products ("CTP"), Dr. Matthew R. Holman, wrote to JUUL to request the submission of:

documents relating to marketing practices and research on marketing, effects of product design, public health impact, and adverse experiences and complaints related to JUUL products. This request applies to research relating to all such tobacco products and their components or parts, including those products for research, investigational use, developmental studies, test marketing, and/or commercial marketing. FDA is requesting these documents based on growing concern about the popularity of JUUL products among youth. JUUL product use appears to be common in middle and high schools based on widespread media reporting describing a rapid growth of use among youth in general and on school property, numerous complaints that have been received by CTP, small research studies that have raised concerns, and social media evidence of youth use. Widespread reports of youth use of JUUL products are of great public health concern and no child or teenager should ever use any tobacco product. Nicotine affects the developing brain and youth may not understand the nicotine or other characteristics of JUUL. JUUL products may have features that make them more appealing to kids and easier to use, thus causing increased initiation and/or use among youth. Similar to other electronic nicotine delivery system (ENDS) products, JUUL product use during adolescence may lead to cigarette smoking or use of other tobacco products in the future. Their appeal may be related to different aspects of the product, including the product design, promotion, or distribution, and CTP seeks information to further understand the appeal and use.

104.   On September 12, 2018, Gottlieb wrote to JUUL to inform it the FDA "is reevaluating its current compliance policy with respect to JUUL brand products and similar

products." The letter stated:

> To fulfill our public health mandate to address youth addiction to nicotine, FDA is reconsidering its compliance policy for submission of PMTAs [premarket tobacco product applications] for your product and other similar products that were illegally sold by retailers . . . including whether earlier enforcement of the premarket review provision might be warranted. The legal standard for FDA premarket review of a new tobacco product under the PMTA provision includes consideration of whether marketing of the product would be appropriate for the protection of the public health. As part of our regulatory decision-making, FDA will consider evidence that e-cigarettes, such as JUUL, contribute to youth use of and addiction to nicotine. Youth are especially vulnerable to the addictive effects of nicotine because their brains are still developing. Because most tobacco use is established during adolescence, actions to prevent youth from the potential lifetime of nicotine addiction are critical.

***

> FDA requests that you take prompt action to address the rate of youth use of JUUL products.

> FDA would like to discuss with you the steps you intend to take to address youth use of your product, in addition to the information outlined in your letter of August 7th. Given the importance of this issue, we request an acknowledgement of receipt of this letter within 15 days and a proposed timeline for meeting with FDA.

> FDA also requests that, within 60 days of receipt of this letter, you provide a written response to this letter that includes a detailed plan, including specific timeframes, to address and mitigate widespread use by minors. For instance, this plan may include:

> - Discontinuing sales to retail establishments that have been subject to an FDA civil monetary penalty for sale of tobacco products to minors within the prior 12 months;

> - Developing or strengthening any internal program you have to check on retailers, and reporting to FDA the name and address of retailers that have sold products to minors;

> - Eliminating online sales, whether through Internet storefronts controlled by your company or other retailers, or providing evidence to demonstrate that your company's online sales practices do not contribute to youth use of JUUL products;

> - Revising your current marketing practices to help prevent use by minors;

> - Removing flavored products from the market until those products can be reviewed by FDA as part of a PMTA.

These are examples of actions that you may take to demonstrate that FDA should

continue to defer enforcement of the premarket review provisions with respect to JUUL products. You are encouraged to provide additional youth use prevention tools for FDA's consideration. The youth tobacco use prevention imperative could affect the marketing of products that may have potential public health benefit for a different population, namely, cigarette smokers who may be seeking alternative forms of nicotine delivery. We recognize the challenge here. But steps must be taken to protect the nation's young people.

105.    Altria was sent a similar letter by Gottlieb on September 12, 2018 concerning its

MarkTen vaping device.

106.    On September 18, 2018, the FDA announced a "new, comprehensive campaign to

warn kids about the dangers of e-cigarette use as part of agency's Youth Tobacco Prevention Plan,

amid evidence of sharply rising use among kids."  Gottlieb was quoted in the announcement as

saying:

> E-cigarettes have become an almost ubiquitous – and dangerous – trend among youth that we believe has reached epidemic proportions. This troubling reality is prompting us to take even more forceful actions to stem this dangerous trend, including revisiting our compliance policy that extended the compliance dates for manufacturers of certain e-cigarettes, including flavored e-cigarettes, to submit applications for premarket authorization. Based on our evidence, we believe the presence of flavors is one component making these products especially attractive to kids. The mandate to reverse this trend in youth addiction to nicotine is one of my highest priorities. I'm employing every tool at my disposal in these efforts. As a parent, a survivor of cancer, and someone entrusted with responsibilities to protect our nation's kids from certain dangers    I won't allow this rising youth use to continue on my watch. The new campaign we're announcing today seeks to snap teens out of their 'cost-free' mentality regarding e-cigarette use with powerful and creative messages that reach kids where they spend a lot of their time: online and in school. In particular, these compelling prevention messages will be displayed in high school bathrooms, a place we know many teens are using e-cigarettes or faced with the peer pressure to do so.
>
> Even as we consider the potential benefits of innovative tobacco products and the role that some such products may play in reducing harm to current adult smokers, the FDA won't tolerate a whole generation of young people becoming addicted to nicotine as a tradeoff for enabling adults to have unfettered access to these same products. No youth should be using any nicotine-containing product, and the trends underway are more than a small amount of casual experimentation among kids. They are evidence of a significant swath of a generation of kids becoming regular users of nicotine. Kids who use e-cigarettes are more likely to try combustible cigarettes. And that jeopardizes the extraordinary public health gains we've made in reducing smoking rates in this nation. Making sure e-cigs aren't being marketed

to, sold to, or used by kids is a core priority and the guiding principle behind our efforts.

107.    Altria and JUUL began "confidential discussions" about a potential equity purchase when the Company contacted JUUL about a commercial relationship in early 2017.

108.    On July 30, 2018, JUUL Defendant Pritzker sent an opening term sheet to Altria Defendant Willard.  JUUL Defendants Pritzker, Valani, and Burns met Altria Defendants Willard and Gifford on August 1, 2018.

109.    JUUL and Altria continued negotiating, and JUUL Defendant Valani met with Altria Defendant Devitre.

110.    During negotiations, JUUL insisted that Altria exit from the e-cigarette market was a non-negotiable condition for any deal.

111.    By early October 2018, Altria was willing to agree to JUUL's demand. Specifically, Altria Defendant Willard informed JUUL Defendants Pritzker, Valani, and Burns that the Company was amenable to exiting the e-cigarette market.

112.    On October 25, 2018, Altria announced it would "remove from the market MarkTen Elite and Apex by MarkTen pod-based products until these products receive a market order from the FDA or the youth issue is otherwise addressed."

113.    JUUL stopped selling its other fruit and dessert flavors in retail stores in 2018 and online in October 2019.

114.    On November 7, 2019, JUUL announced it would discontinue its mint flavor, which represented approximately 70% of JUUL's U.S. sales.

115.    On December 7, 2018, the Company issued a press release announcing the "discontinuation of production and distribution of all MarkTen and Green Smoke e-vapor products and VERVE oral nicotine containing products."  The press release claimed the "decision is based

upon the current and expected financial performance of these products, coupled with regulatory restrictions that burden Altria's ability to quickly improve these products. The company will refocus its resources on more compelling reduced-risk tobacco product opportunities."

116.   The press release added, "Altria expects to record one-time pre-tax charges of approximately $200 million, the majority of which would be non-cash asset impairment charges, in the fourth quarter of 2018 as a result of this decision."

117.   Negotiations between Altria and JUUL resumed after the Company agreed not to compete with JUUL.

118.   The negotiations leading to the agreements were conducted while JUUL was experiencing ongoing legal difficulties. For example, on October 18, 2018, the court in *Colgate v. JUUL Labs, Inc.* declined to dismiss a purported class action brought by thirteen JUUL users, three of whom were minors, alleging various causes of action based on the mislabeling of the amount of nicotine contained in each JUUL pod. 345 F. Supp. 3d 1178 (N.D. Cal. 2018).

119.   Vaping was also getting the attention of state and local regulators in 2018. In June 2018, San Francisco banned the use of flavored liquids for e-cigarettes. On July 24, 2018, the Massachusetts Attorney General announced an investigation into JUUL's marketing and sale to minors.

120.   On December 18, 2018, two days before Altria announced its investment in JUUL, the U.S. Surgeon General issued an advisory on the "epidemic" of e-cigarette use by youths. The advisory singled out JUUL products as particularly problematic, stating:

> E-cigarettes are a rapidly changing product class, and are known by many different names, including "e-cigs," "ehookahs," "mods," and "vape pens." Recently, a new type of e-cigarette has become increasingly popular among our nation's youth due to its minimal exhaled aerosol, reduced odor, and small size, making it easy to conceal. Many of these new e-cigarettes look like a USB flash drive, among other shapes. One of the most commonly sold USB flash drive shaped e-cigarettes is

JUUL, which experienced a 600% surge in sales during 2016-2017, giving it the greatest market share of any e-cigarette in the U.S. by the end of 2017. Other companies are now also starting to sell e-cigarettes that look like USB flash drives.

All JUUL e-cigarettes have a high level of nicotine. A typical JUUL cartridge, or "pod," contains about as much nicotine as a pack of 20 regular cigarettes. These products also use nicotine salts, which allow particularly high levels of nicotine to be inhaled more easily and with less irritation than the free-base nicotine that has traditionally been used in tobacco products, including e-cigarettes. This is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine through these products and also could make it easier to progress to regular e-cigarette use and nicotine dependence. However, despite these risks, approximately two-thirds of JUUL users aged 15-24 do not know that JUUL always contains nicotine.

121.    The SPA, RA, SA, and related agreements were announced on December 20, 2018.

Altria Defendant Willard stated in the press release announcing the agreements:

We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, *a world leader in switching adult smokers*. We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction. Through JUUL, we are making the biggest investment in our history toward that goal. *We strongly believe that working with JUUL to accelerate its mission will have long-term benefits for adult smokers and our shareholders.*

(Emphasis added.)

122.    Altria's press release was materially false and misleading because the Altria Defendants knew, consciously disregarded, or were reckless in not knowing and failed to disclose: (i) that JUUL's marketing was directed towards adolescents and young adults; (ii) JUUL's products were harmful and not a tobacco cessation product; (iii) JUUL's youth marketing scheme subjected Altria, and Altria's investment in JUUL, to material risks and expenses, including reputational, litigation and regulatory actions and fines; (iv) the value of JUUL was significantly overstated and severe regulatory and litigation risks would negatively impact both the value of JUUL and the Company; (v) the risks associated with JUUL's products and marketing practices, and the true value of JUUL and its products were known to the Altria Defendants but were not

communicated to Altria investors; (vi) all of the foregoing, as well as mounting public scrutiny, negative publicity, and governmental pressure on e-vapor products and JUUL in particular made it reasonably likely that Altria's investment in JUUL would negatively affect Altria's reputation and operations; (vii) Altria's agreements with JUUL violated antitrust laws; and (viii) the materialization of these risks would likely require Altria to write-down a material portion of its investment in JUUL.

123.    Altria Defendant Burns said in the same press release:

Altria's investment sends a very clear message that JUUL's technology has given us a truly historic opportunity to improve the lives of the world's one billion adult cigarette smokers. This investment and the service agreements will accelerate our mission to increase the number of adult smokers who switch from combustible cigarettes to JUUL devices.

124.    The press release heaped praise on JUUL, its rapid growth, and its market share, stating:

An Extraordinary E-vapor Company with a Strong Product Pipeline

Fueled by its unique and innovative Silicon Valley approach to product development and founded by former smokers, JUUL has rapidly built an industry-leading position by satisfying adult tobacco consumers with its differentiated e-vapor products.

JUUL has quickly grown both revenue and share, and today represents approximately 30% of the total U.S. e-vapor category. JUUL has a deep innovation pipeline and currently operates in eight countries, with rapid international expansion plans.

"This is a unique and compelling opportunity to invest in an extraordinary company, the fastest growing in the U.S. e-vapor category. We are excited to support JUUL's highly-talented team and offer our best-in- class services to build on their tremendous success," added Willard.

(Footnote omitted).

125.    This statement was materially false and misleading because the Altria Defendants knew or recklessly disregarded but failed to disclose that JUUL's success was based primarily on sales of its vaping products to teenagers and young adults.

126.    The press release claimed Altria's investment in JUUL would "Advance Altria's Long-Term Tobacco Harm Reduction Goal." It stated:

> In 2000, Altria became the first and only company in the industry to support FDA regulation of tobacco products, an important step to providing accurate and scientifically-grounded communications about reduced-risk products to smokers.
>
> Today, the FDA has regulatory authority over all tobacco products, and the FDA *distinguishes between the harm associated with combustible versus non-combustible products*.
>
> Altria will participate in the e-vapor category only through JUUL. The investment complements Altria's non-combustible offerings in smokeless and heat-not-burn, upon FDA authorization of IQOS.[17]

(Emphasis added.)

127.    This statement was materially false and misleading because the Altria Defendants knew or recklessly disregarded but failed to disclose that the federal government, including the FDA and the Surgeon General, had been warning about the dangers of vaping for nearly a year.

128.    Altria acknowledged the risks of youth vaping in the December 20, 2018 press release but downplayed them, stating:

> Commitment to Underage Tobacco Prevention
>
> Altria and JUUL are committed to preventing youth from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. As JUUL previously said, "Our intent was never to have youth use JUUL products. But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem."
>
> As a result, JUUL recently began implementing a number of actions to prevent underage vaping, including stopping the sales of flavored products to retail stores, enhancing age-verification for its online sales, eliminating social media accounts and developing further technology solutions.
>
> JUUL believes that it cannot fulfill its mission to provide the world's one billion adult smokers with a true alternative to combustible cigarettes if youth use continues unabated. Together, JUUL and Altria will work to prevent youth usage

---

[17] IQOS is a "HeatStick" developed by Altria and Philip Morris International, Inc. ("PMI") that looks like a cigarette and heats tobacco instead of burning it. IQOS has been sold in other countries since 2014, and it was approved by the FDA in 2019. Altria is marketing the IQOS in the United States under agreement with PMI.

through their announced initiatives, further technological developments and increased advocacy for raising the minimum age of purchase for all tobacco products to 21.

129.    This statement was materially false and misleading because the Altria Defendants knew or recklessly disregarded but failed to disclose that Altria and JUUL were not committed to preventing underage vaping but rather were counting on the continued use of JUUL's products in order to maintain and increase their profits.

130.    Altria Defendant Willard said during a conference call with analysts on December 20, 2018 following the announcement of the Company's JUUL investment, "[i]mportantly, Altria and JUUL are committed to preventing kids from using any tobacco products.  As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve."

131.    This statement was materially false and misleading because Willard knew or recklessly disregarded but failed to disclose that Altria and JUUL were not "committed to preventing kids from using any tobacco products" or solving the "problem" of underage vaping.

132.    On February 20, 2019, Altria filed a Form 8-K with the SEC that included as an attachment remarks made that day by Willard at the Consumer Analyst Group of New York conference in Boca Raton, Florida.  Willard said during his presentation:

> We entered last year with a desire to strengthen our competitive position with regard to reduced-harm products for adult smokers. We wanted to expand our future growth prospects beyond the domestic tobacco category. And we wanted to create a strong, stable business platform for Altria that we believe would succeed no matter what tobacco category choices adult consumers make.
>
> ***
>
> ***We've followed JUUL's journey rather closely***. Two years ago, JUUL grew rapidly but in a small number of retail stores. Other e-vapor products had achieved periods of brief category leadership often driven by introductory offers, so we watched JUUL carefully to see if it had staying power. We knew JUUL had a unique product, but it wasn't clear whether the product and the brand had the ability to establish long-term leadership and brand equity. During 2018, we concluded that

JUUL had not only become the retail share leader in the U.S. e-vapor category, but that no other brand was close to it in share or future growth potential.

*In addition, it was not until we conducted in-depth due diligence in the fourth quarter of 2018 that we fully grasped the many other strengths and capabilities that we believe position JUUL for long-term leadership and growth both in the U.S. and internationally*. For example, we saw that their product pipeline was significantly more developed, and that their manufacturing capabilities and international plans were more robust than we believed. We then became convinced that JUUL was far more than another temporary leader and that they'd built a platform for long-term success in e-vapor.

(Emphasis added.)

133.   This statement was materially false and misleading because Willard knew or recklessly disregarded but failed to disclose that that JUUL, which uses a nicotine salt formulation of nicotine extracted from natural tobacco leaves and thus qualified as a tobacco product, specifically targeted youth as customers of JUUL products, as described herein.

134.   On February 6, 2019, Gottlieb wrote to Willard and requested a meeting regarding Altria's investment in JUUL and its effects on use of vaping products by minors.  The letter said:

I am writing to request a meeting with you regarding representations you made in a meeting with Food and Drug Administration (FDA) senior leadership on October 18, 2018, and in a written submission that followed, where you acknowledged that Altria Group, Inc. has an obligation to take action to help address the mounting epidemic of youth addiction to tobacco products.

*After Altria's acquisition of a 35 percent ownership interest in JUUL Labs, Inc., your newly announced plans with JUUL contradict the commitments you made to the FDA. When we meet, Altria should be prepared to explain how this acquisition affects the full range of representations you made to the FDA and the public regarding your plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes.*

I am aware of deeply concerning data showing that youth use of JUUL represents a significant proportion of the overall use of e-cigarette products by children. I have no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing. Manufacturers have an independent responsibility to take action to address the epidemic of youth use of their products.

My office will contact you to arrange a meeting to discuss these issues. Pursuant to your request, we intend to schedule this as a joint meeting with both Altria and JUUL.

(Emphasis added.)

135.    Gottlieb sent an identical letter to JUUL Defendant Burns the same day.

136.    Altria initially did not have to obtain Hart-Scott-Rodino Act ("HSR") antitrust clearance because it took a non-voting stake in JUUL.  In February 2019, Altria filed for HSR clearance when it sought to convert its interest into voting securities and activate the right to appoint three of the nine members of JUUL's board.  Altria's filing brought the non-compete provisions in the RA to the FTC's attention.

137.    Altria filed its annual report for the fiscal year ended December 31, 2018, on Form 10-K, with the SEC on February 26, 2019 (the "2018 -10-K").  The annual report minimized the uncertainty of the regulatory and legal environment surrounding vaping products by stating:

> ***Underage Access and Use of E-vapor Products***: The FDA announced in September 2018 that it is using its regulatory authority to address underage access and use of e-vapor products. As part of this effort, the FDA issued letters to manufacturers of certain e-vapor products, including Nu Mark and JUUL, requiring them to (1) discuss with the FDA the steps each manufacturer intends to take to address youth access and use of its e-vapor products and (2) within 60 days provide a detailed written plan to address underage access and use.
>
> In October 2018, Altria responded to the FDA's request for a written plan setting forth the actions it was taking to address underage access and met with the FDA. ***In December 2018, Altria refocused its innovative product efforts, which included the discontinuation of all Nu Mark e-vapor products. Altria's decision was based on current and expected financial performance of its innovative products, as well as regulatory restrictions limiting the ability to quickly improve such products***. Later in December, Altria purchased, through a wholly owned subsidiary, a 35% economic interest in JUUL. Following the announcement of this investment, Altria requested a meeting with the FDA to discuss the transaction and its ongoing support for underage tobacco prevention. ***In February 2018 [sic],[18] the FDA sent Altria a letter expressing concern about this investment given the rise in underage use of e-vapor products and issued a statement indicating that, if the increased trend in underage use of e-vapor products does not reverse, the FDA may unilaterally take action to address the trend. Altria responded by reaffirming its ongoing and long-standing investment in underage tobacco prevention efforts***. For example, Altria is advocating raising the minimum legal age to purchase all tobacco products to 21 at the federal and state levels to further address underage tobacco use. Altria will

---

[18] The correct year is February ***2019***.

meet with the FDA to continue discussing underage e-vapor use.
(Emphasis added.)

138.    The 2018 10-K was signed by Defendant Willard, Defendant Gifford, and Ivan S. Feldman, then-current Altria Controller, and Willard on behalf of the rest of the members of Altria's Board, i.e., Altria Defendants Casteen, Devitre, Farrell, Kelly-Ennis, Kiely, McQuade, Muñoz, Newman, Sakkab, and Shanks.  In addition, Willard and Gifford signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting that the annual report "fairly presents, in all material respects, the financial condition and results of operations of the Company."

139.    The above-cited language in the 2018 10-K was materially false and misleading because the Altria Defendants knew or recklessly disregarded, among other things, (i) that JUUL targeted youth to purchase its products and the money Altria invested in JUUL would be used to target underage consumers of JUUL products, as described herein; and (ii) Altria's discontinuation of its own e-cigarette products resulting from its anti-competitive agreement with JUUL and not from concern about underage vaping.

140.    Further, Willard's and Gifford's SOX certifications were materially false and misleading for the reasons cited in the preceding paragraph.

141.    On March 19, 2019, CNBC reported that Gottlieb said that a meeting held the prior week with Altria and JUUL was "difficult" and "Gottlieb said he did not come away with any evidence that public health concerns drove Altria's decision to invest in Juul, and instead sa[id] it looks like a business decision."[19]  Gottlieb "reiterated that the FDA will consider pulling all pod-based e-cigarettes from the market if teen vaping trends don't improve," and accused Altria and JUUL executives of "reneging on promises they made to help combat teen vaping."[20]

---

[19] Kate Rooney, *Altria shares fall after FDA's Gottlieb describes 'difficult' meeting on Juul*, CNBC (Mar. 9, 2019).
[20] *Id.*

142.    The price of Altria stock declined by $1.29 per share, or over 2%, on March 19, 2019 on this news.

143.    On April 3, 2019, the FDA issued a statement warning that the agency had "become aware that some people who use e-cigarettes have experienced seizures, with most reports involving youth or young adult users." The statement noted that "a recent uptick in voluntary reports of adverse experiences with tobacco products that mentioned seizures occurring with e-cigarette use (e.g., vaping) signal a potential emerging safety issue." The statement said the FDA "continues to monitor all adverse experiences reported to the agency about the use of e-cigarettes and encourages the public to report cases of individuals who use e-cigarettes and have had a seizure."

144.    Altria's closing stock price declined by $2.71 per share, or nearly 5%, on April 3 on heavy trading volume.

145.    On April 8, 2019, Senator Richard J. Durbin sent a letter to Defendant Burns on behalf of himself and ten fellow Senators demanding the production of documents. The letter criticized JUUL's relationship with Altria, stating:

> Nearly one year ago, many of us wrote to you urging that your company immediately take action to reduce youth use of the dangerous and addictive JUUL vaping device. One year later, JUUL is more popular than ever with children and your company has decided to team up with Big Tobacco giant Altria-the maker of Marlboro cigarettes, the most popular cigarette among children in the United States-in a partnership that the American Heart Association has called "a match made in tobacco heaven." The corporate marriage between two companies that have been the most prolific at marketing highly addictive nicotine products to children is alarming from a public health standpoint and demonstrates, yet again, that JUUL is more interested in padding its profit margins than protecting our nation's children. We write today seeking more information regarding JUUL's tactics to hook children on nicotine and to understand what your merger with Altria means for the public health.

146.    On May 16, 2019, Altria held its annual shareholder meeting. Altria Defendant Willard claimed during the meeting that the Company was aware of litigation against JUUL when

Altria decided to invest in JUUL.

147.    The Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform of the United States House of Representatives held a hearing on July 24-25, 2019 entitled "Examining JUUL's Role in the Youth Nicotine Epidemic." Numerous witnesses testified at the hearing about JUUL's efforts to market its products to underage individuals, JUUL's claims regarding the safety of its products, its use of nicotine-salt e-liquids in its products, and the concentration of nicotine in its products. On September 9, 2019, the FDA's Director, CTP, wrote to JUUL and requested documents related to the issues raised during the hearing.

148.    On August 27, 2019, Altria announced it was "in discussions with Philip Morris International, Inc. ["PMI"] regarding a potential all-stock, merger of equals." The merger was estimated to be worth approximately $200 billion.

149.    On August 29, 2019, *The Wall Street Journal* reported the FTC was investigating whether JUUL used marketing practices to appeal to minors.

150.    On August 30, 2019, the FDA and CDC issued a joint statement announcing that they were "working tirelessly to investigate the distressing incidents of severe respiratory disease associated with use of e-cigarette products." The joint statement added that the agencies "learn[ed] of the death of an adult in Illinois who had been hospitalized with a severe respiratory illness following the use of an e-cigarette product." The joint statement also disclosed that, as of August 27, 2019, 215 possible cases of respiratory illness associated with e-cigarette use had been reported, and that "additional reports of pulmonary illness are under investigation."

151.    Between the close of trading on August 28, 2019 and August 30, 2019, the closing price of Altria stock declined by $2.11, or over 4%.

152.    On September 9, 2019, the FDA's Director, Office of Compliance and Enforcement

Center for Tobacco Products sent a Warning Letter to JUUL stating the "FDA has determined that JUUL adulterated its products under section 902(8) of the FD&C Act (21 U.S.C. § 387b(8)) by selling or distributing them as modified risk tobacco products without an FDA order in effect that permits such sale or distribution."   The Warning Letter demanded that JUUL "immediately correct" the violations described in the letter, "as well as violations that are the same as or similar to those stated above, and take any necessary actions to bring your tobacco products into compliance with the FD&C Act."

153.   On September 12, 2019, the CDC announced the "first national aggregate based on the new CDC case definition developed and shared with states in late August."  The CDC reported that "As of September 11, 2019, 380 confirmed and probable cases of lung disease associated with e-cigarette product use, or vaping, were reported by 36 states and the U.S. Virgin Islands."  In addition, there were six deaths in six different states.

154.   The next trading day, September 13, 2019, Altria stock declined $2.45 per share, or 5.5%, to close at $42.01.

155.   On September 23, 2019, the Wall Street Journal reported that "[f]ederal prosecutors in California are conducting a criminal probe into [JUUL]."

156.   According to the August 29, 2019 article in The Wall Street Journal, JUUL's regulatory risks were complicating the merger talks between Altria and PMI.  On September 25, 2019, Altria issued a press release stating merger discussions with PMI had terminated.  The CEO of PMI was quoted in a press release issued by that company the same day as saying, "After much deliberation, the companies have agreed to focus on launching IQOS in the U.S. as part of their mutual interest to achieve a smoke-free future."  (Emphasis added.)

157.   Also, on September 25, 2019, JUUL announced its CEO, JUUL Defendant Burns,

would step down and that it would discontinue all advertising in the U.S. Burns was replaced as CEO by Altria Defendant Crosthwaite, who was Altria's Senior Vice President, Chief Strategy and Growth Officer, from June 2018 until September 2019. Before being appointed JUUL CEO, Crosthwaite sat on JUUL's board as a non-voting observer from Altria with access to JUUL's confidential information. Altria made a "special recognition" payment of $2.5 million upon Crosthwaite's departure from Altria to JUUL.

158.    Altria Defendant Gifford replaced Crosthwaite as Altria's JUUL Board observer. Gifford became Altria's CEO following Individual Defendant Willard's retirement as CEO and Chairman of the Board on April 14, 2020.

159.    On October 14, 2019, Willard responded by letter to Senator Durbin's request for information. The letter stated in part:

> In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products.

160.    On October 31, 2019, Altria announced in a press release concerning its third quarter and nine-month results that it was writing off $4.5 billion of its $12.8 billion investment in JUUL. The press release said:

> Altria recorded a third-quarter non-cash pre-tax impairment charge of $4.5 billion related to its investment in JUUL. While there was no single determinative event or factor, Altria considered impairment indicators in totality, including: increased likelihood of U.S. Food & Drug Administration (FDA) action to remove flavored e-vapor products from the market pending a market authorization decision, various e-vapor bans put in place by certain cities and states in the U.S. and in certain international markets, and other factors.

161.    Three months later, on January 30, 2020, Altria announced in a press release regarding its 2019 fourth quarter and full-year results that it was writing off an additional $4.1

billion of its JUUL investment, for a total of $8.6 billion, or over 67% of its $12.8 investment. The press release said:

> Altria recorded a fourth-quarter, non-cash pre-tax impairment charge of $4.1 billion related to its investment in JUUL. ***This impairment is primarily due to the increased number of legal cases pending against JUUL and the expectation that the number of legal cases against JUUL will continue to increase. Since October 31, 2019, the number of legal cases pending against JUUL has increased by more than 80%.*** Altria has not made any assumptions, or drawn any conclusions, regarding the merits or likelihood of success of any of these cases, litigation is subject to uncertainty and it is possible that there could be adverse developments in pending or future cases. For 2019, Altria recorded a total of $8.6 billion in non-cash pre-tax impairment charges to its JUUL investment, bringing the value of its JUUL investment to $4.2 billion as of December 31, 2019.

(Emphasis added.)

162.    The press release also announced amendments to the SPA and the RA. Among other things, the SPA was amended to provide that the earliest date before which Altria could abandon its efforts to obtain antitrust clearance is December 31, 2021 or, if earlier, the date the FTC commences litigation or closes its investigation.

163.    The price of Altria stock declined by $2.11, or over 4%, on January 30, 2020 to close at $48.00 per share.

164.    On January 2, 2020, shortly before Altria announced its second JUUL impairment, the FDA announced it was "prioritizing enforcement" of unauthorized flavored tobacco (other than menthol) in ENDS e-cigarette products. According to the press release announcing the action, "youth preference for menthol- and tobacco-flavored e-cigarettes is much lower than that for mint- and fruit-flavored e-cigarettes."

165.    By early 2020, the CDC had announced dozens of deaths and thousands of hospitalizations due to lung injuries caused by vaping.

166.    On January 30, 2020, Altria announced amendments to its agreements with JUUL in a press release. According to the press release:

Altria and JUUL agreed to revised terms governing Altria's minority investment in JUUL, which include the following provisions:

- Altria and JUUL are focusing their work together to create compelling pre-market tobacco product applications (PMTA) based on rigorous scientific research and data-driven underage use prevention efforts. As a result, Altria will continue providing regulatory affairs services to JUUL, which includes supporting the company in preparing and submitting its PMTA. Altria will discontinue all other services by the end of March 2020 that were part of the original investment agreement.

- JUUL will, upon antitrust clearance from the U.S. Federal Trade Commission under the Hart-Scott-Rodino Act, restructure its board of directors to consist of two directors designated by Altria, three independent directors, the JUUL CEO and three directors designated by JUUL stockholders other than Altria.

- Upon antitrust clearance, the restructured JUUL Board of Directors will add a nominating committee and a litigation oversight committee to its existing compensation and audit committees.

- Altria has the option to be released from its non-compete obligation if JUUL is prohibited by federal law from selling e-vapor products in the U.S. for at least a year, or if Altria's carrying value of the JUUL investment is not more than 10% of its initial carrying value of $12.8 billion.

167.   On February 21, 2020, *The Wall Street Journal* reported that the SEC had launched an investigation into whether Altria fully disclosed to its shareholders the risks associated with the JUUL Investment.

168.   Altria stock closed at $45.89 per share on February 21, 2020. By February 25, 2020, two trading days later, Altria stock closed at $42.49 per share, a decline of $3.40 per share, or over 7%.

169.   Altria filed its annual report for 2019, on Form 10-K, with the SEC on February 25, 2020 (the "2019 10-K"), after the markets closed. The Company conceded in the report that the JUUL investment was not benefitting Altria as expected. The 2019 10-K stated:

In 2019, we determined that our investment in JUUL was impaired in part due to the increase in the number and type of legal cases pending against JUUL, especially in the fourth quarter of 2019. This impairment and the risks associated with our JUUL investment are discussed further in The expected benefits of the JUUL

transaction may not materialize in the expected manner or timeframe or at all.

***

**The expected benefits of the JUUL transaction may not materialize in the expected manner or timeframe or at all**.

Regardless of whether antitrust clearance is obtained, the expected benefits of the JUUL transaction may not materialize in the expected manner or timeframe or at all, including due to the risks encountered by JUUL in its business, such as operational risks and regulatory risks at the international, federal, state and local levels, including actions by the FDA, and adverse publicity due to underage use of e-vapor products and other factors; unanticipated impacts on JUUL's relationships with employees, customers, suppliers and other third parties; potential disruptions to JUUL's management or current or future plans and operations; or domestic or international litigation developments, investigations, or otherwise. As discussed in Note 19, JUUL and Altria and/or its subsidiaries, including PM USA, are named as defendants in various individual and class action lawsuits. JUUL also is named in a significant number of additional individual and class action lawsuits to which neither Altria nor its subsidiaries is a party. See Tobacco Space - Business Environment in Item 7 for a discussion of certain FDA-related regulatory risks applicable to the e-vapor category, including the potential removal of certain e-vapor products from the market as a result of FDA enforcement action and the potential denial of new tobacco product applications for e-vapor products. Failure to realize the expected benefits of our JUUL investment could adversely affect the value of the investment.

As discussed in Note 7, in 2019, as part of the preparation of our financial statements for the periods ended September 30, 2019 and December 31, 2019, we performed valuations of our investment in JUUL. As a result, we determined that our investment in JUUL was impaired and recorded a total pre-tax impairment charge of $8.6 billion for the year ended December 31, 2019, reported as impairment of JUUL equity securities in our consolidated statements of earnings. Of this amount, Altria recorded pre-tax charges of $4.5 billion in the third quarter of 2019 and $4.1 billion in the fourth quarter of 2019. The third quarter impairment charge was due primarily to lower e-vapor sales volume assumptions in the U.S. and international markets and a delay in achieving operating margin performance, as compared to the assumptions at the time of the JUUL transaction. The fourth quarter impairment charge resulted substantially from increased discount rates applied to future cash flow projections, due to the increase in the number and type of legal cases pending against JUUL during the fourth quarter of 2019. While we believe the December 31, 2019 valuation of $4.2 billion is the appropriate current fair value of our investment, the risks identified in this paragraph, some of which are also further discussed in Note 19 and in Item 7. Tobacco Space - Business Environment, are ongoing with respect to the current fair value. If the fair value of our investment in JUUL continues to decrease, it could have a material adverse effect on Altria's consolidated financial position or earnings.

**Our investment in JUUL includes non-competition, standstill and transfer**

**restrictions that prevent us from gaining control of JUUL. Furthermore, if we elect not to extend our non-competition obligations beyond December 20, 2024, we would lose certain of our governance, consent, preemptive and other rights with respect to our investment in JUUL**.

The shares of JUUL we hold generally cannot be sold or otherwise transferred until December 20, 2024, subject to limited exceptions. We also generally agreed not to compete with JUUL in the e-vapor category until at least December 20, 2024, which may be extended at our election. If, however, JUUL is prohibited by federal law from selling e-vapor products in the U.S. for at least one year or if Altria's carrying value of the JUUL investment is not more than 10% of its initial carrying value of $12.8 billion, we may compete with JUUL in the e-vapor category prior to December 20, 2024. In addition, following receipt of antitrust clearance, JUUL's board of directors will include nine members, three of whom will be designated by Altria, including one independent designee. JUUL's strategy and its material decisions are not and will not be controlled by us, and the terms of our agreements with JUUL mean that we are required to bear the risks associated with our investment in JUUL until at least December 20, 2024, subject to the exceptions mentioned above. Further, if we elect not to extend our non-competition obligations beyond that date, we would lose some or all of our board designation rights, preemptive rights, consent rights and other rights with respect to our investment in JUUL. Loss of these rights could adversely affect us by impairing our ability to influence JUUL.

(Emphasis in original.)

170.    On April 1, 2020, the FTC filed an administrative complaint against Altria and JUUL alleging the SPA and its accompanying agreements violated Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.  The complaint alleged that "Altria's investment in J[UUL] and its nearly simultaneous decision to exit the relevant market in order to meet J[UUL]'s demands not only eliminated its existing e-cigarette products from the market but also, through the Non-Compote [in the Relationship Agreement], halted its ongoing innovation efforts toward developing a new and improved portfolio of products."

171.    The complaint sought, among other things, "[r]elief that restores [Altria's and JUUL's] incentives to compete in the relevant market, including, as appropriate, divestiture of Altria's equity stake in J[UUL], rescission of Altria's purchase of that stake, and/or any other

relief."

172.    On October 30, 2020, Altria announced in a press release that it was writing off an additional $2.6 billion related to its investment in JUUL because of "Altria's projections of lower JUUL revenues over time due to lower pricing assumptions and delays in JUUL achieving previously forecasted operating margin performance." As of September 30, 2020, the value of Altria's $12.8 billion investment in JUUL was reduced to $1.6 billion.   In addition, contemporaneous media reports stated that JUUL had cut its valuation to $10 billion, a drop of $28 billion from Altria's estimated valuation of JUUL of $38 billion in December 2018.

173.    According to Altria's Form 10-Q for the quarter ended September 30, 2020, which was filed with the SEC on October 30, 2020 (the "3Q20 Form 10-Q"), there are 1,145 separate vaping lawsuits pending against the Company. This "[i]ncludes 25 class action lawsuits, two of which were filed in Canada, 1,064 individual lawsuits, 31 state or local government lawsuits and 25 lawsuits filed by school districts relating to JUUL e-vapor products.   JUUL is an additional named defendant in each of these lawsuits." The class actions allege "violation of RICO, fraud, failure to warn, design defect, negligence and unfair trade practices."

174.    The 3Q20 Form 10-Q also predicted a troubled future for the JUUL investment:

As part of the preparation of its financial statements for the periods ended September 30, 2020 and 2019 and December 31, 2019, Altria performed qualitative assessments of impairment indicators for its investment in JUUL and determined that indicators of impairment existed.

JUUL announced a strategic update in September 2020, which includes its plans for a significant global workforce reduction, its evaluation of its resource allocation and the possibility of exiting various international markets. As part of the preparation of Altria's financial statements for the period ended September 30, 2020, Altria performed its qualitative assessment of impairment indicators for its investment in JUUL and determined that JUUL's strategic update was an indicator of impairment at September 30, 2020, *given the significant deterioration in JUUL's business prospects*.

Given the existence of this impairment indicator, Altria performed a quantitative valuation of its investment in JUUL as of September 30, 2020 and recorded a non-

cash pre-tax charge of $2.6 billion for the nine and three months ended September 30, 2020, reported as impairment of JUUL equity securities in its condensed consolidated statements of earnings. The impairment charge was driven by Altria's projections of lower JUUL revenues over time due to lower pricing assumptions and delays in JUUL achieving previously forecasted operating margin performance. These drivers were the result of: (i) JUUL's revised international expansion plans and (ii) the evolving U.S. e-vapor category and associated competitive dynamics.

(Emphasis added.)

175.    The 3Q20 Form 10-Q also warned there may be "additional impairment charges to Altria's investment in JUUL in future periods."

176.    On November 12, 2020, Altria announced it was converting its non-voting shares in JUUL to voting shares, pursuant to the SPA.  The press release announcing the conversion said, "Altria does not currently intend to exercise its additional governance rights obtained upon conversion, including the right to elect directors to JUUL's board, or to vote its JUUL shares other than as a passive investor, pending the outcome of the [FTC] litigation."

177.    The statements in the December 20, 2018 press release, Willard's remarks on December 20, 2018 and February 20, 2019, and the language in the 2019 10-K were all materially false and misleading.  Altria and JUUL were not committed to eliminating underage use of JUUL's products.  Rather, Altria knew its attempt to create and market its own e-cigarette was not as successful as JUUL's.  Altria also knew by December 2018 that JUUL's success was based primarily on marketing flavored nicotine pods to minors and young adults.  Altria's investment in JUUL was intended to help the Company keep pace with a large and growing market for alternative nicotine delivery devices and hook new, young customers, rather than convince combustible cigarette smokers to switch to e-cigarettes.  JUUL was not "committed to preventing youth from using any tobacco products" because it aggressively marketed its products to underage smokers for several years prior to Altria's investment, and continued to do so after the SPA.  In addition, Altria failed to warn investors adequately of the legal and regulatory risks surrounding ENDS e-

cigarette products, particularly JUUL's, and their potential effect on the value of the Company's investment in JUUL.

## DAMAGE TO THE COMPANY

178.   As a result of the Altria Defendants' breaches of their fiduciary duties and other wrongful conduct, and the JUUL Defendants' aiding and abetting thereof, Altria has suffered billions of dollars in damage.

179.   Altria's $12.8 billion investment in JUUL is now estimated to be worth $1.6 billion, a decline of 87.5% in less than two years.  Altria's stock closed at $51.40 per share on December 19, 2018, the day before the agreements with JUUL were announced.  Nearly two years later, Altria's stock now consistently trades in the $40 range.  Further impairment charges to Altria's investment in JUUL likely will result in additional losses and decreases in the Company's stock price.

180.   The Company has incurred and will continue to expend substantial amounts defending the vaping-related lawsuits pending against it.  These actions may result in substantial liability.

181.   In addition, according to the 3Q20 Form 10-Q, "[i]f the FTC's challenge is successful, the FTC may order a broad range of remedies, including divestiture of Altria's minority investment in JUUL, rescission of the transaction and all associated agreements, and prohibition against any officer or director of either Altria or JUUL serving on the other party's board of directors or attending meetings of the other party's board of directors."

182.   The Company is facing the Securities Action, a stockholder class action alleging false and misleading statements and omissions under the Exchange Act relating to Altria's investment in JUUL. *Klein, et al. v. Altria Group, Inc., et al.*, No. 20-cv-00075-DJN (E.D. Va.).

The failure of the Board to implement and maintain adequate internal controls over financial reporting, which resulted in the false statements described above, among others, also poses a substantial risk of liability for the Company.

183.   The talks about a potential merger with PMI have been called off as a result of the JUUL investment.

184.   Altria also damaged its reputation within the business community and in the capital markets, as evidenced by the decline in its market capitalization since the JUUL investment.

## DERIVATIVE ALLEGATIONS

185.   Plaintiff brings this action derivatively in the right and for the benefit of Altria to redress injuries suffered, and to be suffered, by Altria as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the defendants.  Altria is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

186.   Plaintiff owned Altria stock at all times during the time of the wrongful course of conduct constituting the basis for the claims asserted herein and continues to hold such stock.

187.   Plaintiff will adequately and fairly represent the interests of Altria and its shareholders in prosecuting and enforcing its rights, and has retained competent and experienced counsel to prosecute this action.

## DEMAND ON THE BOARD WAS REFUSED
## FOR PLAINTIFF'S STATE LAW CLAIMS

188.   On December 10, 2020, Plaintiff made the Demand on the Company and the Board pursuant to Va. Code Ann. § 13.1-672.1(B)(1) to investigate and commence legal proceedings against the Defendants named herein.  (Exhibit A).

189.   On March 4, 2021, the Board responded to Plaintiff's Demand, stating in full:

The Altria board has authorized this response to your client's December 4 and 10 letters. ***The board is familiar with the history and current status of Altria's investment in JUUL*** and, as part of its inquiry regarding the matters raised in your letters, will continue to be actively engaged in monitoring and overseeing that investment. The board is also actively engaged in monitoring and overseeing the FTC, securities and other litigation referenced in your letters, as well as the ongoing government inquiries concerning JUUL and e-vapor products generally.

The Altria board believes that it is in the best interests of Altria to defend itself in these proceedings, which are at a very preliminary stage. ***After there have been further developments, the board will make a timely and appropriate determination on the matters raised by your letters***, and that determination will promptly be communicated to you. In any event, we will update you once there is a decision on the motion to dismiss the securities litigation.

(Emphasis added (Exhibit B).)

190.     The Board's March 4, 2021 letter constitutes a refusal of Plaintiff's Demand. First, the Board's response notes its familiarity with the allegations, but then fails to address them. Second, the letter makes clear that the Board will not consider or answer Plaintiff's Demand at this time, or indeed at any ascertainable time in the future.  According to the language, the Board will not consider or make a determination on the Demand until "[a]fter there have been further developments" in the Securities Action.[21]

191.     The Company has refused to take suitable action in response to Plaintiff's Demand. Consequently, Plaintiff's Demand has been constructively refused by the Board.

192.     Plaintiff's Demand was served on December 10, 2020 and, as of March 10, 2021, the 90-day period to respond expired.  Irreparable injury to Altria will result by waiting for any longer to commence an action against the Company.  The JUUL investment has been a significant drain on the Company's resources, and Altria continues to face substantial liability and expenses arising from the numerous cases pending against it, including the FTC complaint.  As a result, it

---

[21] Purported Altria stockholders Maria Cecilia Lorca, Thomas Sandys, and Eric Gilbert previously made separate demands on the Board pursuant to Virginia law to investigate and commence litigation regarding the JUUL investment. Upon information and belief, the Board likewise declined to take suitable action in response to each demand within ninety days from the date delivery of the written demand was made on the corporation.

is imperative for the Company to limit its liability and hold the defendants accountable as quickly as possible. The failure to do so will result in continuing financial irreparable injury.

193.    On March 12, 2021, U.S. District Court Judge Nitza I. Quinones Alejandro, sitting for this District Court, substantially denied Altria, the Altria Defendants and the JUUL Defendants' motion to dismiss the Securities Action, finding, *inter alia*:

> Plaintiffs have pled sufficient facts that JUUL targeted youth for its products and that all Defendants knew that JUUL targeted youth. Moreover, Plaintiffs have pled sufficient facts that Defendants recognized the risks that this marketing scheme posed to the value of JUUL and Altria, yet they chose not to disclose it to investors for fear of deflating the values of the company. Although Defendants will have the opportunity to present additional facts and defenses as this litigation continues, at this stage the Court finds that Plaintiffs have pled facts sufficient to survive the Motions to Dismiss.

(Securities Action, Dkt. E. 140 at page 42). This finding guarantees the need for the Company to expend additional significant defense costs and is yet another step towards class wide liability in the Securities Action.

194.    Plaintiff has thus satisfied the condition precedent in Va. Code Ann. § 13.1-672.1(B) to initiating a derivative action on behalf of Altria concerning her state law claims.

## **DEMAND IS FUTILE**

195.    Federal Rule of Civil Procedure 23.1(b)(3) requires a derivative complaint to "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors . . . and (B) the reasons for not obtaining the action or not making the effort."

196.    Plaintiff demanded pursuant to Virginia law that the Board "initiate and complete an investigation into and commence legal proceedings against certain of Altria's current and former directors and officers for violations of the Securities Exchange Act of 1934 . . . , breaches of fiduciary duties, violations of the antitrust statutes, waste of corporate assets, unjust enrichment, and violations of all other laws, regulations, and rules related to the wrongdoing described in this

demand regarding Altria's investment in and relations with JUUL Labs, Inc."

197.    As discussed herein, Plaintiff's Demand under Virginia law has been refused by the Board.

198.    As a result, demand is futile with respect to all claims asserted herein, including those arising under the Securities Exchange Act.[22]

## COUNT I

### Against the Altria Defendants for Violations of
### Section 10(b) of the Securities Exchange Act and Rule 10b-5

199.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

200.    During the Relevant Period, the Altria Defendants disseminated or approved false or misleading statements about Altria and JUUL, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and the Altria Defendants' course of conduct artificially inflated the price of the Company's common stock.

201.    The Altria Defendants violated section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

202.    The Altria Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the

---

[22] Because Plaintiff was required by Virginia law to make a demand on the Board, she has not conceded the Board's independence.

Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Altria stock, which were intended to, and did: (a) deceive Altria and its stockholders regarding, among other things, the Company's operations and financial prospects; and (b) artificially inflate and maintain the market price of Altria stock. Throughout the Relevant Period, the Altria Defendants were in possession of material, nonpublic information regarding the above.

203.    The Altria Defendants were the directors and the senior managers of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

204.    As described above, the Altria Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to the Altria Defendants or were so obvious that they should have been aware of them. Throughout the period of wrongdoing, the Altria Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

205.    As a result of the Altria Defendants' misconduct, the Company has and will suffer damages in that it suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

206.    By reason of such conduct, the Altria Defendants are liable to the Company

pursuant to section 10(b) of the Securities Exchange Act and SEC Rule 10b-5.

207.    Plaintiff brings this claim within two years of the discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

### Against the Altria Defendants for Breaches of Fiduciary Duties

208.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

209.    The Altria Defendants owed and owe Altria fiduciary obligations.  By reason of their fiduciary relationships, the Altria Defendants owed and owe Altria the obligation to act with loyalty, good faith, candor, and due care.

210.    The Altria Defendants knew, consciously disregarded, or were reckless in not knowing that JUUL's products were harmful, marketed to underage customers, and facing increasing regulatory scrutiny and litigation, and that the agreements with JUUL violated the antitrust laws.

211.    In addition, the Altria Defendants made, condoned, and/or failed to correct the materially false statements described herein.

212.    Each and every one of the Altria Defendants breached their fiduciary duties to the Company.

213.    Altria has sustained significant damages as a direct and proximate result of the Altria Defendants' breaches of their fiduciary obligations.

214.    The Altria Defendants are liable to the Company for the damage caused by their breaches of their fiduciary duties.

215.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

## COUNT III

### Against the JUUL Defendants for Aiding and Abetting

216.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

217.    By knowingly inducing the Altria Defendants to invest in JUUL as alleged herein, the JUUL Defendants knowingly participated in the Altria Defendants' breaches of fiduciary duty.

218.    The Company suffered, and is suffering, damages as a proximate result of the Altria Defendants' breach of fiduciary duty.

219.    Consequently, the JUUL Defendants aided and abetted the Altria Defendants in their breaches of their fiduciary duties.

220.    The JUUL Defendants are therefore liable to Altria for the damages Altria has sustained.

221.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

## COUNT IV

### Against the Altria Defendants for Waste of Corporate Assets

222.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

223.    As a result of the breaches of fiduciary duties described herein, the Altria Defendants caused Altria to waste its assets by grossly overpaying for its investment in JUUL.

224.    The Altria Defendants are liable to the Company as a result of the waste of corporate assets.

225.    Plaintiff, on behalf of Altria, has no adequate remedy at law.

## COUNT V

### Against the Altria Defendants for Unjust Enrichment

226.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

227.   The Altria Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching their fiduciary duties owed to Altria.

228.   Plaintiff, as a shareholder and representative of Altria, seeks restitution from the Altria Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their breaches of their fiduciary duties.

229.   Plaintiff, on behalf of Altria, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of Altria and that Plaintiff is a proper and adequate representative of the Company;

B.   Declaring that the Altria Defendants violated section 10(b) of the Securities Exchange Act and SEC Rule 10b-5;

C.   Declaring that the Altria Defendants breached their fiduciary duties to the Company;

D.   Declaring that the JUUL Defendants aided and abetted the Altria Defendants in their breaches of fiduciary duty;

E.   Determining and awarding against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants'

violations of the Securities Exchange Act, breaches of fiduciary duties, aiding and abetting of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment;

F.        Awarding to Altria restitution from the Altria Defendants and the JUUL Defendants and ordering disgorgement of all improperly attained profits, benefits, and other compensation obtained by them;

G.        Directing Altria to take all necessary actions to reform and improve its corporate governance and internal procedures to enable the Company to comply with all applicable laws, and to protect the Company from recurrence of the events described herein;

H.        Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and expenses; and

I.        Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 28, 2021

OF COUNSEL:

RIGORDSKY LAW, P.A.
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: gms@rl-legal.com
Email: vl@rl-legal.com

MOTLEY RICE, LLC
Robert T. Haefele
Gregg S. Levin

*/s/ Steven T. Webster*
Steven T. Webster (VSB No. 31975)
Aaron S. Book (VSB No. 43868)
WEBSTER BOOK LLP
300 North Washington Street, Suite 404
Alexandria, VA 22314
Telephone: (888) 987-9991
Facsimile: (888) 987-9991
swebster@websterbook.com
abook@websterbook.com

Joshua C. Littlejohn
William S. Norton
David D. Burnett
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Email: rhaefele@motleyrice.com
Email: glevin@motleyrice.com
Email: jlittlejohn@motleyrice.com
Email: bnorton@motleyrice.com
Email: dburnett@motleyrice.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: A1318D0B-591E-497C-8BDA-B2B6CAB953C5

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| MARGARET A. RANDOLPH, TRUSTEE<br>FOR THE MARGARET A. RANDOLPH<br>REVOCABLE TRUST U/A 03/06/97,<br>Derivatively on Behalf of ALTRIA GROUP,<br>INC., | )<br>)<br>)<br>)<br>) | Case No.: 3:21cv00209 |
| Plaintiff, | )<br>) | **PLAINTIFF'S VERIFICATION** |
| v. | )<br>)<br>) | |
| WILLIAM F. GIFFORD, JR., HOWARD A.<br>WILLARD III, JOHN T. CASTEEN III,<br>DINYAR S. DEVITRE, THOMAS F.<br>FARRELL II, DEBRA J. KELLY-ENNIS, W.<br>LEO KIELY III, KATHRYN B. MCQUADE,<br>GEORGE MUÑOZ, MARK E. NEWMAN,<br>NABIL Y. SAKKAB, VIRGINIA E.<br>SHANKS, ELLEN R. STRAHLMAN, KEVIN<br>C. CROSTHWAITE, JR., ADAM BOWEN,<br>KEVIN BURNS, JAMES MONSEES, RIAZ<br>VALANI, NICHOLAS J. PRITZKER, and<br>JUUL LABS, INC., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants, | )<br>) | |
| and, | )<br>) | |
| ALTRIA GROUP, INC., | )<br>) | |
| Nominal Defendant. | | |

### VERIFICATION OF MARGARET A. RANDOLPH
### PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23.1(b)

I, Margaret A. Randolph, hereby verify that I have authorized the filing of the attached

Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the

best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/27/2021 _____

DocuSigned by:

_____

MARGARET A. RANDOLPH